**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

RICOH USA, INC.,

Plaintiff,

v.

JOHN W. WALKER; HELEN J. WALKER; FARRAH A. WALKER; FARRAH A. WALKER, as Trustee of the FARRAH A. WALKER TRUST U/T/A 10/15/2008; and FARRAH A. WALKER, as Trustee of the WALKER F.A. DECLARATION OF TRUST,

Defendant.

**CIVIL ACTION NO.**

**<u>COMPLAINT</u>**

Plaintiff Ricoh USA, Inc. ("Ricoh" or "Plaintiff") brings this action for (1) Piercing the Corporate Veil/Alter Ego, (2) Fraud related to Promissory Note Covenants, and (3) Fraudulent Transfer against Defendants JOHN W. WALKER, an individual; HELEN J. WALKER, an individual; FARRAH A. WALKER, individually; FARRAH A. WALKER, as Trustee of the Farrah A. Walker Trust u/t/a 10/15/2008; and FARRAH A. WALKER, as Trustee of the Walker F.A. Declaration of Trust (collectively, "Defendants") and states as follows:

**<u>Nature of the Action</u>**

1. This action arises from Perfect Output, LLC's ("Perfect Output") material breaches of various contracts with Ricoh (collectively, the "Agreements") relating to the lease, maintenance and servicing of office equipment.

2. Perfect Output defaulted on its obligations under the Agreements and failed to appear in the resulting litigation. On June 24, 2025, the United States District Court for the Eastern District of Pennsylvania entered a default judgment against Perfect Output for

$2,123,884.28, plus post-judgment interest. *See Ricoh USA, Inc. v. Perfect Output, LLC*, No. 2:25-cv-00580 (E.D. Pa.).

3. Ricoh registered the judgment in the District of Kansas and pursued collection through garnishment and discovery in aid of execution. Those efforts confirmed that Perfect Output is defunct—it dissolved with the Missouri Secretary of State in January 2026—and has no meaningful assets to satisfy the judgment.

4. Ricoh now brings this action against the individual Defendants—the owners and members of Perfect Output—and pertinent trusts, seeking to pierce the corporate veil, recover damages for fraud related to a promissory note, and avoid fraudulent transfers of assets.

## Parties

5. Ricoh is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 300 Eagleview Boulevard, Exton, Pennsylvania 19341.

6. Upon information and belief, John W. Walker ("John Walker" or "Walker") is an individual residing in and a citizen of Kansas. John Walker is the founder, CEO, Managing Member, and majority owner of Perfect Output, holding 51% of the company's membership units.

7. Upon information and belief, Helen J. Walker ("Helen Walker") is an individual residing in and a citizen of Kansas. Helen Walker is John Walker's wife and holds 10% of Perfect Output's membership units, transferred to her by gift on March 27, 2020.

8. Upon information and belief, Farrah A. Walker ("Farrah Walker") is an individual residing in and a citizen of Kansas. Farrah Walker is John Walker's daughter and holds 39% of

Perfect Output's membership units, acquired through a gift of 20% on March 27, 2020 and an additional transfer of 19% on December 22, 2020.

9. Upon information and belief, Farrah Walker is also named as Trustee of the Farrah A. Walker Trust u/t/a 10/15/2008 and as Trustee of the Walker F.A. Declaration of Trust. Upon information and belief, these trusts hold or are designated to receive assets linked to Farrah Walker's membership interests in Perfect Output and/or real property. Neither trust instrument has been produced. Ricoh reserves the right to amend this Complaint to correct trust names, add co-trustees or successor trustees, or join additional trust entities once the trust instruments are obtained through discovery.

**Jurisdiction and Venue**

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). Complete diversity of citizenship exists between Ricoh and all Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs. The underlying default judgment alone is $2,123,884.28, plus post-judgment interest.

11. Ricoh is a citizen of Delaware (its state of incorporation) and Pennsylvania (its principal place of business).

12. Upon information and belief, Defendant John W. Walker is a citizen of Kansas.

13. Upon information and belief, Defendant Helen J. Walker is a citizen of Kansas.

14. Upon information and belief, Defendant Farrah A. Walker is a citizen of Kansas.

15. The citizenship of a trust for diversity purposes is determined by the citizenship of its trustee. Upon information and belief, Farrah A. Walker is the trustee of both trusts; she is a citizen of Kansas.

16. Complete diversity thus exists.

17. This Court has personal jurisdiction over each Defendant. Upon information and belief, Defendants John Walker, Helen Walker, and Farrah Walker reside at 12600 Meadow Lane, Leawood, Kansas. Each individual Defendant transacted business in Kansas through Perfect Output and committed acts in Kansas giving rise to Ricoh's claims. Farrah Walker is named as trustee in her representative capacity and, as a Kansas resident, is subject to the jurisdiction of this Court in all capacities in which she is sued. Thus, each Defendant is subject to the jurisdiction of this Court.

18. Venue is proper under 28 U.S.C. § 1391(b)(1) because all Defendants reside in Kansas. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District—including Perfect Output's operations, Defendants' management and control of Perfect Output, the siphoning of corporate assets, and the membership interest transfers at issue.

19. The contractual jurisdiction and venue provisions in the underlying Agreements do not bar suit in this District. Ricoh does not bring this action on the Agreements directly. Rather, Ricoh sues the individual Defendants and trusts for piercing the corporate veil, fraud, and fraudulent transfer—claims independent of the Agreements' forum selection clauses.

## **Factual Background**

### ***Ricoh's and Perfect Output's Businesses and Business Relationship***

20. Ricoh is a leading provider of information management and digital services in the United States, providing services including, but not limited to, managed print services, managed document solutions, sustainability, cloud and IT services, information governance, commercial and industrial printing, workflow services, enterprise support, business intelligence, and big data, digital workflow, and digital services.

21. Perfect Output provided products and services relating to office imaging equipment, software, supplies and maintenance services, document workflow process management, outsourcing and staffing, office supplies, and IT equipment and services.

22. Ricoh and Perfect Output maintained a long-term business relationship, partnering to service end-user customers across the country. The relevant contracts (the "Agreements") between Ricoh and Perfect Output are described below.

***The Agreements***

23. On February 9, 2015, Ricoh and Perfect Output entered into a Subcontract to provide services to Lear Corporation (the "Lear Subcontract"). A true and correct copy of the Lear Subcontract is attached as **Exhibit A**.

24. On March 3, 2020, Ricoh and Perfect Output entered into a Master Lease Agreement to lease Ricoh's products and equipment to Grady Memorial Hospital Corporation d/b/a Grady Health System (the "Grady MLA"). A true and correct copy of the Grady MLA is attached as **Exhibit B**.

25. On March 28, 2022, Ricoh and Perfect Output entered into a Master Lease Agreement to lease Ricoh's products and equipment to St. Luke's Health System (the "St. Luke's MLA"). A true and correct copy of the St. Luke's MLA is attached as **Exhibit C**.

26. Also on March 28, 2022, Ricoh and Perfect Output entered into a Master Maintenance & Sale Agreement to provide Ricoh's products and services to St. Luke's (the "St. Luke's MMSA"). A true and correct copy of the St. Luke's MMSA is attached as **Exhibit D**.

27. On October 31, 2022, after Perfect Output failed to pay amounts owed under various contracts, Ricoh and Perfect Output entered into a Promissory Note in the principal amount of $793,170.40 (the "Promissory Note"). John Walker signed the Promissory Note as

CEO of Perfect Output. A true and correct copy of the Promissory Note is attached as **Exhibit E**.

***Perfect Output's Breaches and Default***

28. Perfect Output materially breached each of the Agreements by failing to pay invoices. Under the Promissory Note, it failed to make payments when due and otherwise failed to meet its payment obligations to Ricoh.

29. As of January 2, 2025, Perfect Output owed Ricoh more than $1.75 million because of these breaches—exclusive of interest and other add-ons under the terms of certain of the Agreements.

30. On January 2, 2025, Ricoh served formal notices of default and termination on Perfect Output for each of the Agreements.

31. Except for the Promissory Note, the specific principal amounts Perfect Output owed Ricoh as of January 2, 2025 appear in default notices Ricoh served on Perfect Output on that date, describing Perfect Output's material breaches and defaults and Ricoh's termination (or intent to terminate) the Agreement at issue. True and correct copies of these notices are attached as **Exhibits F** through **J**.

32. On February 3, 2025, Ricoh sued Perfect Output in the United States District Court for the Eastern District of Pennsylvania. *See Ricoh USA, Inc. v. Perfect Output, LLC*, No. 2:25-cv-00580 (E.D. Pa.). Perfect Output never appeared, answered, or otherwise defended the action.

33. On June 24, 2025, the Court entered a default judgment against Perfect Output for $2,123,884.28, plus post-judgment interest. That total breaks down as follows: (a) $345,496.93 for outstanding invoices under the Lear Subcontract; (b) $728,000.90 in invoices, $14,340.25 in

late charges, and $143,826.34 in present value under the Grady MLA; (c) $114,098.31 in invoices and $5,897.34 in late charges under the St. Luke's MMSA; and (d) $643,138.40 in principal under the Promissory Note.

***Collection Efforts and Perfect Output's Insolvency***

34. Ricoh registered the default judgment in the District of Kansas under 28 U.S.C. § 1963.

35. Ricoh served writs of garnishment on Wells Fargo Bank, UMB Financial Services, and Truist Bank. Truist returned $0. Perfect Output's operating account with UMB—which held $73,159.40 as of September 30, 2025—was drained to $0 by January 2026, subject to competing garnishments from other creditors.

36. Perfect Output dissolved with the Missouri Secretary of State in January 2026 and is no longer registered to do business in Kansas. Its counsel characterized the company as "defunct" and offered to have John Walker sign an "affidavit of no assets" instead of answering Ricoh's discovery requests.

***Ownership and Control of Perfect Output***

37. John Walker founded Perfect Output and originally held 100% of its membership units.

38. On March 27, 2020, John and Helen Walker gifted 20% of Perfect Output's membership units to their daughter, Farrah Walker. The executed Gift Letter states that "there is no repayment expected or implied in this gift, either in the form of cash or by future services."

39. On December 22, 2020, John Walker transferred an additional 19% of membership units to Farrah Walker by Action of Unanimous Written Consent of the Members.

After this transfer, ownership stood at John Walker 51%, Helen Walker 10%, and Farrah Walker 39%.

40. As Managing Member and CEO, John Walker exercised complete dominion and control over Perfect Output's finances, operations, and business decisions. Perfect Output had no independent board, held no regular member meetings, and failed to observe LLC formalities.

***Siphoning of Assets and Walker Family Distributions***

41. From 2021 through 2023, John Walker and his family members received more than $2.5 million in distributions from Perfect Output.

42. Specifically, K-1 schedules show that in 2022, John Walker received $688,994 in cash distributions and Helen Walker received $135,096. In 2021, family distributions totaled about $885,867. In 2023, John Walker received $162,801 and Helen Walker received $54,701.

43. These distributions occurred while Perfect Output was undercapitalized and operating at losses. In 2022, Perfect Output reported a net operating loss of ($1,019,916) while simultaneously distributing $1,350,968 to the Walker family. By year-end 2023, John Walker's capital account showed a deficit of about $2.5 million.

44. In October 2024, Perfect Output's UMB operating account was retitled to include Farrah Walker's personal name, blending individual and entity identities. About $984,000 in accounts receivable dropped off Perfect Output's books between December 2024 and September 2025 without corresponding explanations or supporting entries in the records produced.

***The Promissory Note Representations***

45. In Section 6 of the Promissory Note, Perfect Output represented and warranted that: (a) it had full power and authority to enter into the Note; (b) executing and delivering the Note would not breach or constitute a default under any other agreement to which it was bound;

(c) the Note was a valid and legally binding obligation; and (d) it had good and marketable title to the Collateral subject to no security interest, lien, or encumbrance other than Permitted Liens.

46. In Section 5, Perfect Output covenanted to maintain at all times good and marketable title to all Collateral free and clear of any security interest, lien, or encumbrance, and not to lease, mortgage, pledge, or encumber the Collateral or permit any security interest or lien to arise with respect to it.

47. The representation in Section 6(b)—that execution of the Note would not breach any other agreement—was false when made. At the time John Walker signed the Note in October 2022, Perfect Output was bound by a Security Agreement with the U.S. Small Business Administration (effective July 17, 2020) that prohibited Perfect Output from granting security interests, liens, or other encumbrances in the Collateral without SBA's written approval. By granting Ricoh a blanket lien on all assets in Section 4 of the Note, Walker caused Perfect Output to breach its SBA Security Agreement. The Section 5 covenant—to maintain good and marketable title to all Collateral free and clear of liens—was made with no present intention to perform. Within months, Perfect Output encumbered the same Collateral with multiple new liens without Ricoh's consent or knowledge, including filings by Taylor Print & Visual Impressions, Inc. (June 2023), ByzFunder NY LLC (July 2024), Litefund Solutions LLC (July 2024), and Top Tier Capital (November 2024). Walker, as CEO, had direct knowledge of the SBA restriction and of Perfect Output's deteriorating financial condition. Walker made these representations and covenants to induce Ricoh to accept the Note in lieu of immediate collection. Ricoh relied on them to its detriment.

***Assets in Family Trusts and the ByzFunder and LiteFund Judgments***

48. Upon information and belief, real property at 2809 W. 145th Street, Overland Park, Kansas, is held in the name of the "Farrah A. Walker Trust." Real property at 12600 Meadow Lane, Leawood, Kansas, is held in the name of the "Walker F.A. Declaration of Trust."

49. Upon information and belief, Farrah Walker's 39% membership interest in Perfect Output is designated with a Transfer on Death beneficiary to the Farrah A. Walker Trust.

50. Another creditor—Byzfunder NY LLC ("Byzfunder")—obtained a judgment in New York state court against Perfect Output, John Walker, and Farrah Walker for about $417,000. That judgment was domesticated in Johnson County, Kansas, and satisfied on February 10, 2026.

51. Creditor Litefund Solutions LLC ("Litefund Solutions") obtained a similar judgment in the Supreme Court of New York, Niagara County, against Perfect Output, John Walker, and Farrah Walker for $291,995.75. *See Litefund Solutions LLC v. Perfect Output, LLC, et al.*, Index No. E185598/2024 (N.Y. Sup. Ct., Niagara Cnty.). The court entered that judgment on January 16, 2025. It was satisfied on or about January 27, 2026. Byzfunder and Litefund Solutions were the only creditors to recover meaningful amounts from Perfect Output—and both did so by suing the Walkers personally.

52. Upon information and belief, Defendants diverted assets from Perfect Output to the Walker family trusts and to themselves individually to hinder, delay, or defraud Ricoh and other creditors.

**<u>First Cause of Action</u>**

**(PIERCING THE CORPORATE VEIL/ALTER EGO)**

53. Ricoh incorporates all the preceding paragraphs by reference.

54. Under Kansas law, courts will disregard the separate legal existence of an LLC when there is "such domination of finances, policy, and practices that the controlled [entity] has no separate mind, will, or existence of its own and is but a business conduit for its principal," and recognition of the separate entity would result in injustice. *Dean Operations, Inc. v. One Seventy Assocs.*, 257 Kan. 676, 681, 687 (1995). Kansas courts apply alter-ego principles to LLCs.

55. Although K.S.A. § 17-7688(a) provides that an LLC's debts are solely those of the LLC, this statutory shield does not protect members who use the entity as a mere instrumentality for their personal business. The alter ego doctrine provides an equitable mechanism to overcome the shield when the circumstances here are present.

56. John Walker dominated Perfect Output's finances, policies, and practices such that the LLC had no separate mind, will, or existence of its own. The following facts show this domination:

***Undercapitalization***

57. John Walker's capital account showed a deficit of about $2.5 million by year-end 2023. Perfect Output operated at significant losses—reporting a net operating loss of ($1,019,916) in 2022—while distributing more than $1.35 million to its members that same year.

***Failure to observe formalities***

58. Upon information and belief, Perfect Output had no independent board, held no regular member meetings, maintained no formal compensation agreements, and failed to document the basis for distributions. Its registered agent, CSC-Lawyers Incorporating Service Company, resigned in December 2025 without replacement.

***Siphoning of funds***

59. From 2021 through 2023, John Walker and his family members received more than $2.5 million in distributions from Perfect Output while the LLC was insolvent and failed to pay Ricoh. After the judgment, customer deposits continued to flow into the UMB operating account but reached $0 by January 2026, with checks payable to Walker family members.

***Use as a facade***

60. Perfect Output operated as a conduit for the Walker family's financial affairs. The UMB operating account was retitled to include Farrah Walker's personal name. Upon information and belief, the LLC paid Walker family members' personal attorneys from its operating accounts. And the LLC carried life insurance recorded on Perfect Output's balance sheet as a corporate asset.

***Injustice***

61. Perfect Output is defunct with no meaningful assets to satisfy the judgment. The only creditors to recover anything from Perfect Output—Byzfunder NY LLC and Litefund Solutions LLC—did so by suing the Walkers personally. Without veil-piercing, the Walkers will retain the millions they siphoned from the company while Ricoh's $2.1 million judgment remains unsatisfied. That is the injustice Kansas law requires.

62. John Walker is personally liable as the controlling member and alter ego of Perfect Output.

63. Helen Walker is personally liable as a member who benefited from the scheme by receiving distributions while Perfect Output was insolvent and failing to pay creditors.

64. Farrah Walker is personally liable as a member who received distributions, whose trusts hold or are designated to receive assets linked to her membership interests, and who held full signatory authority over Perfect Output's bank accounts.

65. The Farrah A. Walker Trust u/t/a 10/15/2008 and the Walker F.A. Declaration of Trust are liable to the extent they hold assets traceable to Perfect Output or to the Walker members' fraudulent or inequitable conduct.

66. Ricoh is entitled to a declaration that each Defendant is the alter ego of Perfect Output and is jointly and severally liable for the full default judgment amount, plus post-judgment interest, costs, and attorneys' fees.

## Second Cause of Action

## (FRAUD RELATED TO PROMISSORY NOTE COVENANTS)

67. Ricoh incorporates all the preceding paragraphs by reference.

68. This cause of action sounds in fraud and is pleaded with the particularity required by Federal Rule of Civil Procedure 9(b).

69. Under Kansas law, a fraud claim requires clear and convincing proof that: (1) the defendant made a false statement of an existing, material fact; (2) the defendant knew it was false or made it recklessly without knowing whether it was true; (3) the statement was made to induce the other party to act; (4) the other party reasonably relied on it; and (5) that reliance caused damage.

70. On October 31, 2022, John Walker, as CEO of Perfect Output, signed the Promissory Note. In Section 6 of the Note, Perfect Output represented and warranted in writing that: (a) it had full power and authority to enter into the Note and perform its obligations; (b) executing and delivering the Note would not breach or constitute a default under any other

agreement to which it was bound; (c) the Note was a valid and legally binding obligation; and (d) it had good and marketable title to the Collateral subject to no security interest, lien, or encumbrance other than Permitted Liens. The Note defined "Collateral" to include all of Perfect Output's assets of any kind—including general intangibles, equipment, accounts receivable, customer lists, customer contracts, and all after-acquired property—that is, everything Perfect Output owned or would come to own.

71. In Section 5, Perfect Output covenanted in writing to maintain at all times good and marketable title to all Collateral free and clear of any security interest, lien, or encumbrance, and not to lease, mortgage, pledge, or encumber the Collateral or permit any security interest or lien to arise with respect to it. The Note narrowly defined "Permitted Lien" to mean only: (a) a lien to which Ricoh granted its prior written consent; (b) a lien in Ricoh's own favor; (c) a lien securing statutory obligations (such as taxes) not yet due; or (d) a lien already validly existing and fully perfected as of November 1, 2022. Any lien outside these four categories violated Section 5.

72. Perfect Output's representation in Section 6(b)—that execution of the Note would not result in a breach of any other agreement—was false when made. At the time Walker signed the Note in October 2022, Perfect Output was bound by a Security Agreement with the U.S. Small Business Administration ("SBA") (effective July 17, 2020) that granted the SBA a security interest in all of Perfect Output's tangible and intangible personal property—including inventory, equipment, accounts, and deposit accounts—and that prohibited Perfect Output from "sell[ing], leas[ing], licens[ing] or otherwise transfer[ring] (including by granting security interests, liens, or other encumbrances in) all or any part of the Collateral" without the SBA's "written or electronically communicated approval." By granting Ricoh a blanket lien on all

assets in Section 4 of the Note, Walker caused Perfect Output to breach its SBA Security Agreement. Walker, as CEO, knew of this restriction.

73. Walker made the covenant in Section 5 of the Note with no intent to perform it. When he signed the Note in October 2022, Perfect Output was losing money—reporting a net operating loss of ($1,019,916) that year—while distributing $1,350,968 to the Walker family and taking on new secured debt to fund operations. Within months of making this covenant, Perfect Output encumbered the same Collateral with multiple new liens, each of which violated Section 5: (a) a Credit and Security Agreement with Taylor Print & Visual Impressions, Inc. (June 2023) granting a blanket lien on all accounts, receivables, equipment, and inventory; (b) a Revenue Purchase Agreement with ByzFunder NY LLC (July 2024) with a blanket security interest in all future receipts; (c) a Merchant Cash Advance Agreement with Litefund Solutions LLC (July 2024) granting a first-priority security interest in all assets; and (d) a UCC filing by Top Tier Capital (November 2024) covering all of Perfect Output's assets. Not one qualified as a Permitted Lien under the Note. Each was created after November 1, 2022—so none was "already validly existing and fully perfected" as of that date. None was in Ricoh's favor. None secured statutory obligations like taxes. And Ricoh never consented to any of them. Each lien thus violated Section 5's bar on encumbering the Collateral and allowing new security interests to attach. Walker never told Ricoh of any of these liens.

74. Throughout the Note and Forbearance Agreement negotiations, Walker concealed from Ricoh that he had transferred 39% of Perfect Output's membership units to his daughter Farrah Walker in 2020. This was material to Ricoh's assessment of Perfect Output's creditworthiness, its ability to collect against the LLC, and the risk that assets would be diverted

to family members. Had Ricoh known the true ownership structure, it would have sought personal guarantees or taken other protective measures.

75. Walker knew these representations and covenants were false or made with no intent to perform when he made them. As CEO and Managing Member, Walker had direct access to Perfect Output's financial records, UCC filings, loan agreements, and membership structure. He knew Perfect Output was insolvent and operating at a loss. He knew the SBA Security Agreement prohibited granting additional liens without SBA consent. He knew he had no intention of maintaining the Collateral free and clear of new encumbrances—as demonstrated by the rapid and continuous encumbrance of the Collateral beginning within months of signing the Note. He made these written representations and covenants to induce Ricoh to accept the Promissory Note—which restructured Perfect Output's existing debts—and to forbear from immediate collection.

76. Ricoh justifiably relied on Walker's representations in entering into the Promissory Note and the Forbearance Agreement. Ricoh accepted the Note instead of immediately collecting more than $793,000 in past-due amounts owed by Perfect Output. Ricoh further forbore from suing while the Forbearance Agreement was in effect. Had Ricoh known the representations were false, it would not have agreed to restructure the debt or delay collection.

77. John Walker is personally liable for his fraud regardless of the LLC form. Under Kansas law, an LLC member or manager who personally commits fraud is individually liable for damages caused by that fraud. The LLC limited-liability statute (K.S.A. § 17-7688(a)) limits liability for the LLC's debts; it is not a shield for a member's own actionable conduct.

78. Walker's fraud caused Ricoh damages independent of the underlying contract debt. His false representations induced Ricoh to accept the Promissory Note—restructuring more than $793,000 in past-due amounts—and to forbear from immediate collection. During the resulting delay, Walker drained Perfect Output of its remaining assets, encumbered its Collateral with competing liens, and rendered the company judgment-proof. Had Ricoh known the truth, it would have pursued collection in late 2022—when Perfect Output still had meaningful assets. Ricoh's fraud damages include: the lost opportunity to collect against a then-solvent entity; the costs incurred in the prior Eastern District of Pennsylvania litigation; garnishment proceedings; and post-judgment discovery to collect against what proved to be a defunct shell; and additional consequential damages caused by Walker's misrepresentations, in amounts to be proven at trial.

**<u>Third Cause of Action</u>**

**(FRAUDULENT TRANSFER — KUFTA)**

79. Ricoh incorporates all the preceding paragraphs by reference.

80. To the extent the following allegations assert actual-intent fraudulent transfer under K.S.A. § 33-204(a)(1), they are pleaded with the particularity Rule 9(b) requires. The constructive-fraud claims under K.S.A. §§ 33-204(a)(2) and 33-205(a) do not require fraudulent intent and are evaluated under Rule 8(a)'s plausibility standard.

81. Under K.S.A. § 33-204(a)(1), a transfer is fraudulent as to a creditor if made "with actual intent to hinder, delay or defraud" the creditor. When several badges of fraud under K.S.A. § 33-204(b) are present, an inference of fraudulent intent arises.

82. Under K.S.A. § 33-204(a)(2), a transfer is constructively fraudulent if the debtor made the transfer without receiving reasonably equivalent value and the debtor (A) was engaged or about to engage in a business or transaction for which its remaining assets were unreasonably

small in relation to the business or transaction, or (B) intended to incur, or reasonably should have believed it would incur, debts beyond its ability to pay as they became due. Under K.S.A. § 33-205(a), a transfer is separately fraudulent as to a present creditor if made without reasonably equivalent value while the debtor was insolvent.

83. Ricoh was a present creditor at the time of each transfer challenged below. Ricoh's claims against Perfect Output arose no later than February 2015 (the Lear Subcontract) and continued through October 2022 (the Promissory Note).

84. **The following transfers are challenged as fraudulent:** (a) On March 27, 2020, John and Helen Walker gifted 20% of Perfect Output's membership units to Farrah Walker for zero consideration. The executed Gift Letter states: "there is no repayment expected or implied in this gift, either in the form of cash or by future services." (b) On December 22, 2020, John Walker transferred an additional 19% of membership units to Farrah Walker by Action of Unanimous Written Consent, again without consideration. (c) From 2021 through 2023, Perfect Output distributed more than $2.5 million in cash to Walker family members, including $688,994 to John Walker and $135,096 to Helen Walker in 2022, about $885,867 in family distributions in 2021, and $162,801 to John Walker and $54,701 to Helen Walker in 2023. Upon information and belief, these distributions were not made in exchange for reasonably equivalent value (e.g., services or bona-fide debt repayment). (d) Perfect Output's UMB operating account was drained from $73,159.40 to $0 between September 2025 and January 2026. (e) Upon information and belief, about $984,000 in accounts receivable dropped off Perfect Output's books between December 2024 and September 2025, having been written off or transferred without supporting documentation or reasonably equivalent value.

85. The ByzFunder judgment of about $417,000—running against Perfect Output, John Walker, and Farrah Walker—was satisfied on February 10, 2026. Upon information and belief, it was paid with Walker-family funds while Ricoh's $2.1 million judgment remained unsatisfied.

86. The Litefund Solutions judgment of $291,995.75—also running against Perfect Output, John Walker, and Farrah Walker—was satisfied on or about January 27, 2026. Upon information and belief, it too was paid with Walker-family funds while Ricoh's judgment went unpaid.

87. **The following badges of fraud under K.S.A. § 33-204(b) are present:** (a) **Insider transfers.** The membership unit transfers were made to Farrah Walker— John Walker's daughter and a member of Perfect Output with signatory authority over its bank accounts—an insider within the meaning of K.S.A. § 33-201(g). (b) **Retention of control.** After transferring 39% to Farrah Walker, John Walker retained 51% ownership and continued to exercise unilateral control as Managing Member and CEO. (c) **Concealment.** The 2020 membership transfers were not disclosed to Ricoh during the October 2022 Promissory Note negotiations or the late 2024 Forbearance Agreement negotiations. (d) **No consideration.** The Gift Letter expressly states zero consideration. Upon information and belief, the cash distributions were not made in exchange for services or other value. (e) **Insolvency.** Upon information and belief, Perfect Output operated at losses while John Walker's capital account deficit reached about $2.5 million by year-end 2023. (f) **Timing.** The distributions continued while Perfect Output owed Ricoh more than $2 million and was failing to pay, and the depletion of Perfect Output's remaining assets continued after the June 2025 default judgment. (g) **Absconding or removal of assets.** Perfect Output dissolved in January 2026, its registered agent resigned without replacement, and

about $984,000 in accounts receivable dropped off the books between December 2024 and September 2025 without corresponding explanations or supporting entries in the records produced.

88. None of the challenged transfers were made for reasonably equivalent value. The membership unit gifts were for zero consideration. Upon information and belief, the cash distributions were equity returns that reduced member capital accounts while Perfect Output's liabilities exceeded the fair value of its assets.

89. Each Defendant is liable as a transferee. John Walker, Helen Walker, and Farrah Walker each received distributions from Perfect Output. Farrah Walker also received the membership unit transfers. Upon information and belief, the Farrah A. Walker Trust u/t/a 10/15/2008 and the Walker F.A. Declaration of Trust hold or are designated to receive assets traceable to the challenged transfers.

90. Under K.S.A. § 33-207, Ricoh is entitled to: (a) avoidance of the transfers to the extent necessary to satisfy its claim; (b) attachment or other provisional remedy against the transferred asset or other property of the transferee in accordance with K.S.A. §§ 60-701 to -741; and (c) equitable relief, including an injunction against further disposition by the debtor or a transferee, appointment of a receiver, or other relief the circumstances require. In addition, under K.S.A. § 33-208(b), Ricoh may obtain a money judgment against each transferee (or the person for whose benefit the transfer was made) for the value of the asset transferred, or the amount necessary to satisfy Ricoh's claim, whichever is less. Because Ricoh has obtained a judgment on its claim—the June 24, 2025 default judgment against Perfect Output, registered in this District—it may, if the Court so orders, levy execution on the assets transferred or their proceeds under K.S.A. § 33-207(b).

91. All challenged transfers fall within the applicable limitations periods. Under K.S.A. § 33-209(a), actual-intent claims must be brought within four years of the transfer or, if later, within one year after the transfer was or could reasonably have been discovered. Ricoh first learned of the 2020 membership transfers during post-judgment discovery in late 2025; those actual-intent claims are timely under § 33-209(a)'s discovery savings clause. Under K.S.A. § 33-209(b), constructive fraud claims must be brought within four years of the transfer. The 2023 distributions and the 2022 distributions made on or after July 2, 2022 are within four years of this July 2, 2026 filing. Any earlier 2022 distributions are pleaded under § 33-204(a)(1) (actual intent) and are timely under § 33-209(a).

## PRAYER FOR RELIEF

Plaintiff, Ricoh USA, Inc. demands judgment and relief in its favor, and against all Defendants on all causes of action as follows:

A. For a declaratory judgment that each Defendant is the alter ego of Perfect Output, LLC, and is jointly and severally liable for the full amount of the judgment entered against Perfect Output on June 24, 2025 in the amount of $2,123,884.28, plus all accrued post-judgment interest.

B. For compensatory damages against John Walker for fraud, including: the lost opportunity to collect against Perfect Output before Walker rendered it insolvent; the costs Ricoh incurred in the prior collection litigation and post-judgment proceedings; and additional consequential damages caused by Walker's fraudulent representations—in an amount to be proven at trial.

C. For avoidance of the fraudulent transfers identified in this Complaint under K.S.A. § 33-207; for attachment or other provisional remedy against the assets transferred or

their proceeds; for a money judgment against each transferee Defendant for the value of the assets transferred; and for injunctive relief prohibiting Defendants from further transferring, encumbering, or dissipating assets pending resolution of this action.

D. For attorneys' fees and costs incurred in this action as permitted by law or equity.

E. For pre-judgment and post-judgment interest as may be permitted by law, independent of the interest rates in the Agreements; and

F. For such other and further relief as this Court may deem equitable, just, and proper.

*Respectfully submitted,*

Dated: July 2, 2026

**DUANE MORRIS LLP**

By: */s/ Lucas C. Wohlford*

Lucas C. Wohlford (KS Bar 25798)
Duane Morris LLP
200 Crescent Court, Suite 900
Dallas, TX 75201
Telephone: 214.257.7214
Fax: 214.853.5271
Email: LWohlford@duanemorris.com

Lawrence H. Pockers
(*Pro Hac Vice* forthcoming)
Miranda S. Bovit
(*Pro Hac Vice* forthcoming)
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: 215.979.1153
215.979.1137
Fax: 215.689.3761
856.874.4381
Email: LHPockers@duanemorris.com
MSBovit@duanemorris.com

Ryan S. Crawford
(*Pro Hac Vice* forthcoming)
Duane Morris LLP
750 B Street, Suite 2900
San Diego, California 92101-4681
Telephone: 619.744.2200
Fax: 619.744.2201
Email: RCrawford@duanemorris.com

*Attorneys for Plaintiff Ricoh USA, Inc.*